IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JULIE TRAINOR, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>QWEST GOVERNMENT SERVICES, )<br>INC., )<br>    Defendant. | Case No. 1:18-cv-1557 |

## MEMORANDUM OPINION

At issue in this employment dispute is defendant's Motion to Strike Plaintiff's Jury Demand. Defendant argues that plaintiff's jury demand must be stricken because plaintiff knowingly and voluntarily gave up her right to a jury trial when she signed four documents containing jury waivers. Plaintiff responds that the jury waivers are unenforceable because defendant cannot prove that her consent to the waivers was voluntary. Alternatively, plaintiff argues that even if the jury waivers are enforceable, they do not apply to her claims because her claims arose prior to the waivers, which are not retroactive. For the reasons discussed *infra*, the jury waivers are enforceable and one of the waivers expressly applies to plaintiff's claims. As such, defendant's Motion to Strike Plaintiff's Jury Demand must be granted.

I.

According to the Second Amended Complaint, plaintiff Julie Trainor was employed by Level 3 Communications ("Level 3") as an account director. In that capacity, Trainor was responsible for the procurement and management of federal contracts. Trainor was paid a salary and earned commission in accordance with the Level 3 commission plan. Pursuant to the plan, Trainor was paid a small portion of her commission on a sale sixty days after the government paid

1

Level 3's invoice. The remainder—and the bulk—of Trainor's commission was paid in February of the following year, and then only if Trainor remained employed at that time. Thus, if Trainor was not employed in February of the year following the closing of a contract, she was not entitled to receive the bulk of her commission on the deal.

On November 1, 2017, defendant Qwest Government Services, Inc. (d/b/a CenturyLink QGS) ("Qwest") acquired Level 3. At the time, Trainor expected to receive $245,000 in commission in February 2018. Qwest extended offers of employment to a number of Level 3's employees, including Trainor. On November 15, 2017, Trainor formally accepted employment with Qwest, signing the letter extending Trainor an offer of employment ("Offer Letter"). The Offer Letter included an attachment containing the terms and conditions of Qwest's employment offer. As relevant here, the Offer Letter contained an express waiver of both Trainor's and Qwest's rights to litigate claims against the other before a jury. Specifically, the Offer Letter provided, in relevant part, that

> As used in this Attachment, "CenturyLink" means any subsidiary or affiliate of CenturyLink, Inc. (including subsidiaries and affiliates of CenturyTel, Embarq, Qwest, Savvis, or Level 3), and any predecessor or successor to those subsidiaries or affiliates. . . .
>
> To the extent permissible by law, you voluntarily, knowingly and intelligently waive any right you may have to a jury trial with respect to any Claims . . . . CenturyLink also voluntarily, knowingly and intelligently waives any right it may have to a jury trial with respect to any Claims. . . .
>
> The term "Claims" . . . means any claim, controversy or dispute between you and CenturyLink relating in any way to your hiring, employment, compensation, terms and conditions of employment, the termination of your employment, or the interpretation of your offer letter or any attachment to it . . . .

Pl.'s Ex. 1, 5, 7.

Subsequently, Qwest announced its commission plan for 2018. Trainor accepted Qwest's 2018 commission plan by signing three agreements ("Commission Plans") in March and May

2

2018.[1] These agreements also contained express waivers of Trainor's and Qwest's right to a jury. Specifically, each Commission Plan provided that

> The 2018 Sales Compensation Agreement . . . is by and between the subsidiary or affiliate of CenturyLink, Inc., which is Participant's employer, . . . and/or its parent, successor and affiliated companies ("the Company") and the Plan Participant identified on the Acknowledgement ("you," "Participant," or "Plan Participant"). . . .
>
> Both the Company and Plan Participant voluntarily, knowingly and intelligently agree to waive their right to jury trial regarding any and all claims or causes of action arising out of or relating to Plan Participant's employment with the Company. This waiver includes, but is not limited to, claims or causes of action relating to Plan Participant's application, hiring, employment, resignation, discharge, termination, and wages . . . .

Def.'s Ex. 6, 2–3 (formatting altered).

Trainor remained employed by Qwest until December 21, 2018. On December 17, 2018, Trainor initiated this action against Qwest. Her Second Amended Complaint asserts claims of: (i) discrimination in pay, in violation of the Equal Pay Act;[2] (ii) discrimination, in violation of Title VII of the Civil Rights Act of 1964;[3] (iii) hostile work environment, in violation of Title VII; (iv) retaliation, in violation of Title VII; and (v) retaliatory hostile work environment, in violation of Title VII. Trainor demanded a trial by jury.

Qwest now seeks to strike Trainor's jury demand, arguing that she knowingly and voluntarily waived her right to a jury trial when she signed the Offer Letter and the three Commission Plans containing jury waivers.[4] Trainor admits that she signed the Offer Letter and

---

[1] Trainor signed the Commission Plans on March 5, 2018; March 7, 2018; and May 16, 2018.

[2] 29 U.S.C. § 206(d).

[3] 42 U.S.C. § 2000e, *et seq.*

[4] When Qwest filed its Motion to Strike Plaintiff's Jury Demand, the Amended Complaint was the operative complaint. Following the hearing on Qwest's motion, Trainor filed a Second Amended Complaint, also containing a jury demand. The Second Amended Complaint adds Title VII claims that were previously unexhausted. The parties agree that the arguments supporting and opposing Qwest's motion apply equally to the jury demand in Trainor's Second Amended Complaint and that further briefing or oral argument is unnecessary.

3

thrice signed the Commission Plan. However, Trainor argues that the jury waivers these documents contain are unenforceable because Qwest cannot prove her consent to the jury waivers was voluntary. This, Trainer contends, is because she would not have received the $245,000 in commission she expected in February 2018 had she refused to sign the Offer Letter and the Commission Plans, as she was required to be employed in February 2018 to receive the $245,000 in commission. Alternatively, Trainor argues that even if the jury waivers are enforceable, they do not apply to her claims because her claims arose prior to the waivers, which are not retroactive.

For the reasons that follow, Trainor's consent to the jury waivers was voluntary, and the Offer Letter's jury waiver expressly applies to Trainor's claims. As such, Qwest's Motion to Strike Plaintiff's Jury Demand must be granted.

## II.

The Seventh Amendment right to a jury "is of course a fundamental one." *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir. 1986). Nevertheless, the right can "be knowingly and intentionally waived by contract." *Id.* A party seeking to enforce a jury waiver in a contract signed before litigation was contemplated must prove that the other party's consent to the waiver was both knowing and voluntary.[5] *Id.* at 833. Factors relevant to the waiver inquiry include, but are not limited to, the conspicuousness of the waiver, the parties' relative bargaining power, the sophistication of the party challenging the waiver, and whether the contract terms were negotiable. *Id.*

---

[5] The Fourth Circuit has acknowledged a circuit split as to whether the party seeking to enforce a jury waiver must prove the waiver was knowing and voluntary or the party seeking to avoid a jury waiver must prove the waiver was not knowing and voluntary and has clearly held that the burden is on the enforcing party. *See Leasing Serv. Corp.*, 804 F.2d. at 833. *Compare Nat'l Equip. Rental Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977) (burden is on party seeking to enforce waiver), *with K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir. 1985) (burden is on party seeking to avoid waiver).

4

Trainor argues that she is entitled to a jury despite the Offer Letter and the Commission Plans' jury waivers because (i) Qwest cannot prove her consent to the waivers was voluntary and (ii) the waivers do not apply to Trainor's claims because they arose prior to execution of the waivers, which are not retroactive. Trainor's first argument fails, as Qwest has established that Trainor's consent to the jury waivers was voluntary. And although Trainor is correct that the Commission Plans' jury waivers do not clearly apply to her claims, the Offer Letter's jury waiver expressly applies to her claims.

A.

First, Trainor argues Qwest cannot prove that her consent to the waivers was voluntary.[6] Specifically, Trainor argues that she signed the waivers under economic duress because she would not have received the $245,000 in commission she expected in February 2018 had she refused to sign the waivers.

Contrary to Trainor's contention, Qwest has established that Trainor's consent was voluntary. Indeed, Trainor signed four separate documents stating that her consent was voluntary. Trainor signed the Offer Letter, which stated that she "voluntarily, knowingly and intelligently" waived her right to a jury trial. Pl.'s Ex. 1, 7. And Trainor signed the three Commission Plans, each of which stated that she "VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY WAIVE[D]" her right to a jury trial. Def.'s Ex. 6, 3. *See Snydor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001) (formatting altered) (in concluding waiver was voluntary, noting that plaintiffs signed agreement stating they "voluntarily and knowingly waive any rights they have to a jury trial").

---

[6] Trainor does not dispute that her consent to the waivers was knowing.

5

The factors identified by the Fourth Circuit as relevant to assessing the validity of a contractual jury waiver—the conspicuousness of the waiver, the parties' relative bargaining power, the sophistication of the party challenging the waiver, and whether the contract terms were negotiable—support the conclusion that Trainor's waivers were voluntary. *See Leasing Serv. Corp.*, 804 F.2d at 833. First, the waivers were conspicuous. Although the Offer Letter waiver was on the third page of a four-page attachment, the font size was normal. And, importantly, the waiver was immediately underneath the following capitalized, bolded, and underlined headline: "**<u>JURY TRIAL AND CLASS ACTION WAIVER—COURT PROCEEDINGS</u>**." Pl.'s Ex. 1, 7. As such, although the waiver was more than halfway through the attachment, the headline's formatting was more than sufficient to draw attention to the waiver. The Commission Plans' waivers were even more conspicuous. Specifically, the capitalized, bolded statement "**I UNDERSTAND THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, I AM GIVING UP THE RIGHT TO A TRIAL BY JURY**" appeared as the second item on a five-item list of terms on the page Trainor signed. Def.'s Ex. 6, 1. The complete waiver was located on the second page of the five-page Commission Plans. Like the Offer Letter's waiver, the Commission Plans' waivers were preceded by an attention-grabbing headline: "**<u>Waiver of Right to Jury Trial</u>**." *Id.* at 3. Given these prominent headings, the jury waivers were clearly conspicuous. Indeed, Trainor does not dispute that she was aware of the waivers.

Second, the parties' relative bargaining power suggests that although Qwest likely had the advantage in bargaining, the imbalance was not so extreme as to preclude Qwest from demonstrating that Trainor's consent was voluntary. It is true that an employer typically has greater bargaining power than its employees. But Trainor has alleged facts that indicate she was a particularly valuable employee. Indeed, Trainor alleges that she "managed to secure more and

larger contracts than her" coworkers. Second Am. Compl. ¶ 23. And Trainor contends that she "made an immediate impact on [Level 3] by expanding the products it offered to clients and adding value for vendors[,] . . . pull[ing] in $12 million in profits in her first five months." *Id.* ¶ 10. Trainor thus concludes that she "was a very valuable employee for" Qwest. *Id.* ¶ 10. As Trainor sees it, she was a particularly desirable employee that Qwest had a significant interest in hiring and retaining. The parties' relative bargaining power thus was not so unequal as to preclude a finding of voluntariness.

Third, Trainor's sophistication in the business—and, specifically, contracting—world strongly suggests that her consent was voluntary. Trainor has worked in this field for twenty-eight years. *Id.* ¶ 8. As Trainor describes it, her job for Level 3 and Qwest was to procure and manage contracts. Pl.'s Opp'n 1. Specifically, Level 3 and Qwest tasked her, *inter alia*, with "overseeing the bidding, award, and implementation of contracts [and] writing and developing statements of work for the solutions, services, and materials being sold." Second Am. Compl. ¶ 19. Given this, Trainor is highly sophisticated. Indeed, Trainor's sophistication is confirmed by her claim that she "was so successful that she pulled in $12 million in profits in her first five months with" Level 3 in part because she "carefully read[] contracts to find the most efficient way to produce business." *Id.* ¶ 10. A highly sophisticated businesswoman who negotiates contracts for a living—and who credits her "careful[] reading" of those contracts as partially responsible for $12 million in profits—can surely be expected to understand and voluntarily enter a contract with her employer. Accordingly, Trainor's sophistication strongly suggests that her assent to the jury waivers was voluntary.

Finally, the potential for negotiation of the contract terms also supports the conclusion that Trainor's consent was voluntary. Although there is no evidence that Trainor did indeed negotiate

7

the terms of the Offer Letter or Commission Plans, nor is there any evidence that she attempted unsuccessfully to do so.[7] That such a highly sophisticated and successful businesswoman who has made a career out of negotiating contracts seemingly did not even attempt to negotiate the terms of her employment contract or commission plan suggests not a lack of voluntariness, but rather genuine assent to the terms. Accordingly, the four factors the Fourth Circuit has identified as relevant to assessing the validity of a jury waiver points persuasively to the conclusion that Trainor's consent to the waivers was voluntary.

Trainor's contention that she signed the waivers under economic duress does not alter the conclusion that she voluntarily consented to the jury waivers. As an initial matter, Trainor's argument is facially deficient with respect to the jury waivers in the three Commission Plans. This is so because Trainor contends that she was under economic duress when she signed all four jury waivers because refusal to sign would have prevented her from receiving the $245,000 in commission she expected in February 2018. Yet, Trainor signed the three Commission Plans in March and May 2018, after Trainor received the $245,000 in commission. Accordingly, Trainor's contention that she would not have received the $245,000 in commission in February 2018 had she refused to sign the Commission Plans in March and May 2018—one to three months *after* receiving the $245,000 commission—is meritless.[8] A claim of economic duress is unfounded where, as here, the alleged source of that economic duress has been removed.

---

[7] The Offer Letter provided that "[i]n the event that you decline this offer, your employment will terminate upon a date agreed to by you and CenturyLink." Pl.'s Ex.1, 3. This does not preclude the possibility that Trainor could have negotiated the terms of the Offer Letter. It does reveal that Qwest did not intend to open negotiations with Trainor, but it is unknown how Qwest would have responded had Trainor sought to negotiate the terms. Indeed, an offeror frequently presents an offer as one to be accepted or rejected, yet nonetheless accepts a counteroffer or enters negotiations in response to a counteroffer. Moreover, that Qwest contemplated termination on a date mutually agreed to by the parties if Trainor did not accept employment with Qwest suggests that Qwest was open to negotiating with Trainor.

[8] Notably, Trainor does not allege that she would have been required to forfeit commission already received if she refused to sign the Commission Plans. Trainor contends only that her employment would have been terminated, and

8

Trainor's contention that she would not have received the $245,000 in commission in February 2018 had she not signed the Offer Letter in November 2017 is not similarly temporally deficient. Nevertheless, this contention does not, for a variety of reasons, alter the conclusion that Trainor's jury waiver was voluntary.

The voluntariness of Trainor's consent to the Offer Letter's jury waiver is first evidenced by the reasonable alternatives Trainor had to waiving her jury right. The availability of reasonable alternatives is essential to determining whether a waiver was voluntary. *See, e.g., Leasing Serv. Corp.*, 804 F.2d at 833 (explaining that defendants' jury waiver was knowing and voluntary in part because plaintiff's "competitor waited outside [during negotiations] in the event the [defendants] did not obtain a favorable agreement"); *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977) (relying, in part, on fact that defendant "did not have any choice but to accept the . . . contract as written" in finding that jury waiver was neither knowing nor intentional). Here, Trainor had reasonable alternatives. First, Trainor may have been able to negotiate the terms of the Offer Letter to exclude the jury waiver. Trainor does not allege that she even attempted to negotiate the terms. Second, even assuming Qwest would not have agreed to exclude the jury waiver, Trainor could have refused to sign the Offer Letter and negotiated for a termination date after her commission was paid. *See* Pl.'s Ex. 1, 3 ("In the event that you decline this offer, your employment will terminate upon a date agreed to by you and CenturyLink."). Finally, even assuming Qwest would neither negotiate the jury waiver nor agree to a termination date after Trainor's commission had been paid, Trainor still had a reasonable alternative—refuse to sign the Offer Letter and seek other employment. Although Trainor argues this alternative is unreasonable, courts have

---

thus she would not have received the February 2018 commission, had she refused to sign the Commission Plans in March and May 2018. Trainor Decl. ¶ 3.

9

concluded that conditioning employment on the waiver of rights is not coercive. As the Second Circuit noted, "[i]t is well-settled . . . that conditioning employment on the acceptance of an agreement to arbitrate disputes, [which requires waiving one's right to a jury,] . . . is not itself unlawfully coercive." *Williams v. Parkell Prods, Inc.*, 91 F. App'x 707, 708 (2d Cir. 2003). Thus, the availability of reasonable alternatives demonstrates Trainor's consent to the Offer Letter's jury waiver was voluntary.

Trainor's argument that, notwithstanding this precedent, the choice she was presented with was coercive because she would have lost not only future employment but also $245,000 in anticipated commission is unavailing. Trainor admits that she was not entitled to the $245,000 at the time she was presented with the Offer Letter. Trainor Decl. ¶ 2. Indeed, Trainor admits that she was only entitled to receive the $245,000 if she was employed in February 2018. When Qwest purchased Level 3, Qwest was not obligated to extend Trainor an offer of employment. If Qwest had not extended Trainor such an offer, she would not have been employed in February 2018 and thus would never have become entitled to the $245,000 in commission. Given this, it is difficult to suggest Qwest's offer of employment and attendant mutual jury waiver was coercive merely because Trainor would not receive the $245,000—to which she was not entitled—if she refused the offer.[9] Indeed, the $245,000 Trainor expected was not unlike Trainor's expectation of future employment. Just as Trainor was not entitled to future employment, nor was she entitled to the $245,000. Of course, the $245,000 is distinct in that Trainor had already made the deals on which the $245,000 commission was based. But when Qwest presented Trainor with the Offer Letter, she had no greater entitlement to the $245,000 than she had to employment with Qwest. It is clear that

---

[9] This, of course, assumes that Qwest would not have agreed to a termination date after Trainor received her commission.

conditioning employment on a waiver is not unlawfully coercive,[10] and Trainor has failed to demonstrate that effectively conditioning commission to which one is not entitled on a waiver is sufficiently different to require a contrary conclusion.

Furthermore, that Trainor signed three additional jury waivers *after* receiving the $245,000 in commission is strong evidence that her original jury waiver was voluntarily.[11] Had Trainor signed the Offer Letter involuntarily due to economic duress, she would be expected to refuse to sign future waivers once the economic duress had been removed. When Trainor signed the three Commission Plans with jury waivers—on March 5, 2018; March 7, 2018; and May 16, 2018—she had already received her full commission. Yet, despite the removal of the source of the alleged economic duress, Trainor subsequently signed a jury waiver *on three separate occasions*. These three additional waivers are inconsistent with the theory that Trainor signed the Offer Letter jury waiver involuntarily to prevent losing the $245,000 in commission.

Moreover, accepting Trainor's argument would make it virtually impossible for employers to obtain valid jury waivers from employees paid commissions at any time other than the very outset of employment. Under Trainor's theory, an employer could only obtain a valid jury waiver after an employee had received all commission she expected from prior deals and before she began work on any new deals. At any other time, the employee could claim, as Trainor does, that she had no choice but to sign because her alternative was to quit and forfeit the commission for sales she had had worked on but had not yet been paid commission on. Thus, under Trainor's theory, the window of time in which an employer could obtain a valid jury waiver from an employee who is

---

[10] *See, e.g., Williams,* 91 F. App'x at 708.

[11] For the reasons discussed *infra*, it is not clear that the Commission Plans' jury waivers apply to Trainor's claims insofar as those claims are based on Level 3's conduct. Accordingly, the Commission Plans are not relied on as the source of Trainor's jury waiver. Rather, they are merely evidence of the voluntariness of Trainor's consent to the Offer Letter's jury waiver.

11

paid commissions is quite small, if indeed it exists at all. This result underscores the implausibility of Trainor's theory.

Indeed, although the standard for the voluntary waiver of jury rights is demanding, it is not insurmountable. The Fourth Circuit has found a waiver valid even where it was not explicit. In *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002), the Fourth Circuit concluded that the plaintiff "knowingly and voluntarily waived her Seventh Amendment right to a jury trial" by signing an arbitration agreement even though "it d[id] not include an express jury waiver provision." The Fourth Circuit reasoned that "[c]ommon sense dictate[d] that [it] reject" the plaintiff's argument that her waiver could know have been knowing and voluntary without an express jury waiver provision because "[t]he loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." *Snowden*, 290 F.3d at 638. (citation omitted). Notably, the Fourth Circuit is not alone in this view. *See Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001) (concluding jury right was validly waived by arbitration agreement that did not include a jury waiver provision). Thus, the Fourth Circuit's conclusion that a waiver can be knowing and voluntary even when it is not express indicates that the standard is not insurmountable.

Finally, the case Trainor primarily relies on is both factually and legally inapposite and thus does not compel a contrary conclusion. In *Johnson v. City of Columbia, S.C.*, 949 F.2d 127, 131–32 (4th Cir. 1991), the Fourth Circuit concluded that the plaintiff "did not expressly agree to the exclusion of sleep time and meal time from his compensable hours of work" despite signing an agreement to that effect because there was no meeting of the minds under South Carolina law and the defendant's actions constituted duress under South Carolina law. *Johnson* is factually inapposite because the plaintiff there contemporaneously protested the agreement he signed and

the defendant improperly "force[d] [plaintiff] to sign an 'express agreement' by threatening discharge in order to circumvent [plaintiff's] already stated views." *Johnson*, 949 F.2d at 132. Trainor did not protest waiving her jury right, and the Offer Letter and Commission Plans were not Qwest's attempt to circumvent any such protest. As such, *Johnson* is factually inapposite.

*Johnson* is also legally inapposite. Trainor relies on *Johnson* for an explanation of the economic duress doctrine and when it applies,[12] but *Johnson* involves South Carolina's economic duress doctrine. South Carolina law is inapplicable here because the validity of Trainor's jury waiver is governed by federal law.[13] *See In re County of Orange*, 784 F.3d 520, 526–27 (9th Cir. 2015); *Leasing Serv. Corp*, 804 F.2d at 832–33; *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir. 1985). Thus, *Johnson* is legally inapposite. Accordingly, Qwest has demonstrated that Trainor's waiver was voluntary, and Trainor's economic duress argument does not alter this conclusion.

## B.

Finally, Trainor argues that the jury waivers do not apply to her claims because they arose prior to her execution of the waivers, which are not retroactive. Trainor's Second Amended Complaint alleges Equal Pay Act and Title VII claims based on conduct that began in 2015, when Trainor was employed by Level 3, and continued through 2018, when Trainor was employed by Qwest. As such, Trainor's claims are based on conduct that began prior to her execution of the

---

[12] Trainor also relies on *Johnson* for the proposition that a contract provision may be invalid due to economic duress, but this proposition is uncontroversial.

[13] To the extent Trainor argues that the Offer Letter is unenforceable as a matter of state contract law, the parties agree that Virginia law applies. Under Virginia law, "[d]uress exists when a defendant commits a wrongful act sufficient to prevent a plaintiff from exercising his free will, thereby coercing the plaintiff's consent." *Goode v. Burke Town Plaza, Inc.*, 436 S.E.2d 450, 452 (Va. 1993). Trainor has not met this standard; she has neither shown that Qwest committed a wrongful act nor not shown that Qwest prevented her from exercising her free will. As discussed *supra*, Trainor had reasonable alternatives to consenting to the jury waiver.

jury waivers. Although it is a close question whether the Commission Plans' jury waivers apply to Trainor's claims, the Offer Letter's jury waiver expressly applies to Trainor's claims.

The Commission Plans' jury waivers plainly have some retroactive effect, but it is less clear whether they apply to Trainor's claims. The Commission Plans' jury waivers apply to "any and all claims or causes of action arising out of or relating to Plan Participant's employment with the Company[,]" including, *inter alia,* those "relating to Plan Participant's application [and] hiring." Def.'s Ex. 6, 3 (formatting altered). The Commission Plans define "the Company" as "the subsidiary or affiliate of CenturyLink, Inc., which is Participant's employer, . . . and/or its parent, successor and affiliated companies." *Id.* at 2. Qwest is an affiliate of CenturyLink, Inc. and Trainor's employer. As such, "the Company" includes Qwest. However, "the Company" does not include Level 3. The Commission Plans' definition of "the Company" includes Qwest's "parent, successor and affiliated companies[,]" but does not include its predecessor companies. *Id.* Thus, the Commission Plans' jury waiver applies to all claims arising out of or relating to Trainor's employment with Qwest. Given this, it is clear the waivers have some retroactive effect; they expressly apply to claims relating to Trainor's hiring by Qwest, which occurred months before Trainor signed the waivers. Nevertheless, it is not clear the waivers apply to Trainor's claims, as they are based on in part on Trainor's employment with Level 3, and the jury waiver applies only to claims relating to Trainor's employment with Qwest.

The Offer Letter's jury waiver, however, expressly applies to Trainor's claims. That waiver applies, in part, to "any claim, controversy, or dispute between [Trainor] and CenturyLink relating in any way to [Trainor's] hiring, employment, compensation, [and] terms and conditions of employment[.]" Pl.'s Ex. 1, 7. The Offer Letter's definition of "CenturyLink" clearly includes both Qwest and Level 3. Specifically, "CenturyLink" is defined as "any subsidiary or affiliate of

14

CenturyLink, Inc. . . . and any predecessor or successor to those subsidiaries or affiliates."[14] *Id.* at 5. Qwest is an affiliate of CenturyLink, Inc., and Level 3 is a predecessor to Qwest. Thus, because the Offer Level's definition of "CenturyLink" includes both Qwest and Level 3, its jury waiver applies to any "claim, controversy, or dispute between [Trainor] and [Qwest or Level 3] relating in any way to [Trainor's] hiring, employment, compensation, [and] terms and conditions of employment." This clearly encompasses Trainor's Equal Pay Act and Title VII claims, as they are claims or disputes regarding Trainor's compensation and terms and conditions of employment with Qwest and Level 3.[15] And, despite Trainor's contention, the jury waiver clearly has retroactive effect. The waiver expressly applies to claims and disputes between Trainor and Qwest or Level 3 relating to Trainor's hiring and employment, and Level 3 hired Trainor four years before she signed Qwest's Offer Letter. As such, the Offer Letter's jury waiver has retroactive effect and applies to Trainor's claims.

In sum, although the Commission Plans' jury waivers do not clearly encompass Trainor's claims, the Offer Letter's jury waiver expressly encompasses her claims. And, as discussed *supra*, Trainor's waiver of her jury right was knowing and voluntary. Accordingly, Trainor validly waived her jury right for these claims, and Qwest's Motion to Strike Plaintiff's Jury Demand must be granted.

An appropriate Order will issue.

Alexandria, Virginia
July 31, 2019

T. S. Ellis, III
United States District Judge

---

[14] This definition is located immediately underneath the heading of the Offer Letter's attachment in normal sized font and is thus plainly conspicuous. Pl.'s Ex. 1, 5.

[15] Moreover, the Offer Letter expressly includes claims pursuant to Title VII. Pl.'s Ex. 1, 7.

15